# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

S.J. LOUIS CONSTRUCTION, INC.,

               Plaintiff,

v.

CITY OF WAUKESHA,

               Defendant.

Case No. 24-CV-272-JPS

**ORDER**

## 1.    INTRODUCTION

In this action, Plaintiff S.J. Louis Construction, Inc. ("SJ Louis") sues the City of Waukesha (the "City") for breach of contract, breach of the implied duty of good faith and fair dealing, breach of implied warranties, unjust enrichment, and for interest on late payments under Wisconsin Statutes § 66.0135(3). ECF Nos. 1 (complaint), 19 (supplemental complaint). The case is now before the Court on the parties' motions for partial summary judgment, each of which addresses independent issues. ECF Nos. 43, 51. Each motion is fully briefed. ECF Nos. 44, 53, 58 (SJ Louis motion); ECF Nos. 52, 54, 57 (City motion). For the reasons stated herein, both motions will be denied in full.

## 2.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable

substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). "Summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001) (citing *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001)).

### 3.    RELEVANT FACTS[1]

#### 3.1    General Background

The City created a system called the Great Lakes Water Supply Program (the "Program"), the purpose of which is to transition the City's drinking water from a radium-contaminated aquifer supply to Lake Michigan water. The City, as owner, contracted with SJ Louis, as prime contractor, to construct three of the seven separate segments of the system (the "Project(s)"), namely Contract Package 2B ("CP2B"), Contract Package 5 ("CP5"), and Contract Package 6 ("CP6").

On each Project, SJ Louis was contracted to construct portions of the 30-inch underground pipeline and appurtenances according to the contract documents, which include (but are not limited to) plans and specifications furnished by the City and prepared on the City's behalf by its design engineer, Greeley & Hansen ("G&H"). Black & Veatch Corporation ("Black & Veatch" or "B&V") was the Resident Project Representative.[2] The

---

[1]In accordance with the Court's protocols for summary judgment motions, ECF No. 8 at 6–10, the parties have submitted joint statements of undisputed and disputed facts. ECF Nos. 45, 50. The Court has drawn the below summary of facts from these submissions, making minor edits for clarity and brevity. The Court has further omitted legal assertions and facts that do not ultimately affect the Court's analysis and/or which the parties did not themselves reference in the briefing. Citations to the statements of fact and the underlying record are omitted except where noted, such as when language is quoted directly. Citations to the record are omitted from later analysis.

Where a capitalized term is used but not defined, the Court uses it with the same meaning that it has in the statement of undisputed facts or in the underlying material in the record. The parties use some defined terms inconsistently in the fact statements and the briefing. *Contrast, e.g.*, ECF No. 50 at 1 (definitions of "Program" and "Projects") *with* ECF Nos. 44 and 52 (definition of "Project"). The Court has attempted to reconcile these inconsistencies in this Order.

[2]The parties also reference Great Water Alliance ("GWA") at points in their undisputed fact statement, but do not explain the role of this entity. According to

underground pipeline was to be installed through a combination of 1) open cut trenching and 2) trenchless installation methods consisting of jack and boring and horizontal directional drilling ("HDD").

The City and SJ Louis entered a contract for each of CP2B, CP5, and CP6 (the "Contract Package(s)" or the "Contract(s)"). These three Contract Packages are governed by identical general conditions (the "General Conditions"), which the parties filed at ECF No. 50-4. Each Contract Package further contains specific agreements or supplemental conditions (the "Supplemental Conditions"), which the parties filed at ECF Nos. 50-1, 50-2, and 50-3. The Supplemental Conditions for each Contract Package are largely (but not entirely) consistent with one another. In certain instances, the Supplemental Conditions for a specific Contract Package may modify the General Conditions. The Contract Packages further include Specification Books. *See* ECF No. 50-19 (reproducing certain portions of some Specification Books).

General Conditions Article 11 sets forth the change order process for the Projects, which required SJ Louis to submit a change order request ("COR") to the City any time it sought 1) an increase in the price of a Contract ("contract price") or 2) an extension of time for the Projects ("contract time"). If the COR was denied in whole or in part, General Conditions Article 12 sets out the claims process to dispute that denial.

---

its website, GWA is "the Waukesha Water Utility's project delivery team" for the Program. *About GWA*, GREAT WATER ALL., https://greatwateralliance.com/about/ [perma.cc/L8KV-AF5X] (last visited March 18, 2026). GWA includes the Waukesha Water Utility as well as other "government agencies at the state and local levels" and "other interested parties." *Id.*; *see also* ECF No. 19 at 2 n.1 ("The City, its design team, its inspection team, and its project representative B&V referred to themselves collectively . . . as the Great Water Alliance ("GWA").").

SJ Louis submitted a total of 120 CORs across the three Contract Packages: twenty-four for CP2B, forty-one for CP5, and fifty-five for CP6. Its CORs and claims were prepared by or at the direction of its Project Manager Frank Wizner ("Wizner"), in the normal course of business and based on the knowledge of Wizner, SJ Louis's Project Engineer, or others with knowledge of SJ Louis's work on the Projects.

**3.2 Facts Pertaining to Final Completion Liquidated Damages**

**3.2.1 CP2B Contract**

The CP2B Contract provides:

4.02 Days to Achieve Substantial Completion and Final Payment

. . .

B. The Work will be substantially completed . . . by July 14, 2023.

C. The Work will be completed and ready for final payment . . . by September 12, 2023.

4.03 Liquidated Damages

A. CONTRACTOR [SJ Louis] and OWNER [the City] recognize that time is of the essence of this Agreement and that OWNER will suffer financial loss if the Work is not completed within the times specified in paragraph 4.02 above plus any extensions thereof allowed in accordance with Article 11 of the General Conditions. They also recognize the delays, expense and difficulties involved in proving in a legal or arbitration proceeding the actual loss suffered by OWNER if the Work is not completed on time. Accordingly, instead of requiring any such proof, OWNER and CONTRACTOR agree that as liquidated damages for delay (but not as a penalty) CONTRACTOR shall pay OWNER the amounts listed below.

. . .

2. Three Thousand Eight Hundred dollars ($3,800.00) per calendar day for the first thirty calendar days and Eight Thousand Four Hundred dollars ($8,400) for each calendar day thereafter that expires after the time specified in paragraph 4.02 above for Substantial Completion until the Work is substantially complete.

3. After Substantial Completion, if CONTRACTOR shall neglect, refuse or fail to complete the remaining Work within the Contract Time or any proper extension thereof granted by OWNER, CONTRACTOR shall pay OWNER Three Thousand Seven Hundred dollars ($3,700.00) for each calendar day that expires after the time specified in paragraph 4.02 above for completion and readiness for final payment until the Work is completed and ready for final payment.

4. If CONTRACTOR shall neglect, refuse or fail to complete the remaining Work by August 31, 2023, CONTRACTOR shall pay OWNER Four Thousand One Hundred dollars ($4,100.00) for each calendar day that expires after August 31, 2023.

ECF No. 50-1 at 4–5.

The City later approved CORs submitted by SJ Louis and granted SJ Louis eleven additional days with respect to CP2B, extending its deadline to achieve Substantial Completion to July 25, 2023. The City asserts that, based on the CORs the City approved with respect to CP2B, SJ Louis's deadline to achieve Final Completion was September 23, 2023. The City further asserts that SJ Louis has not achieved Final Completion with respect to CP2B.

### 3.2.2 CP5 Contract

The CP5 Contract provides:

4.02 Days to Achieve Substantial Completion and Final Payment

    A. The Work will be substantially completed within 630 calendar days after the date when the Contract Times commence to run as provided in . . . the General Conditions, and completed and ready for final payment . . . within 690 calendar days after the date when the Contract Times commence to run.

4.03 Liquidated Damages

    A. CONTRACTOR [SJ Louis] and OWNER [the City] recognize that time is of the essence of this Agreement and that OWNER will suffer financial loss if the Work is not completed within the times specified in paragraph 4.02 above plus any extensions thereof allowed in accordance with Article 11 of the General Conditions. They also recognize the delays, expense and difficulties involved in proving in a legal or arbitration proceeding the actual loss suffered by OWNER if the Work is not completed on time. Accordingly, instead of requiring any such proof, OWNER and CONTRACTOR agree that as liquidated damages for delay (but not as a penalty) CONTRACTOR shall pay OWNER the amounts listed below.

        1. Three Thousand Seven Hundred dollars ($3,700.00) for each calendar day that expires after the time specified in paragraph 4.02 above for Substantial Completion until the Work is substantially complete.

        2. After Substantial Completion, if CONTRACTOR shall neglect, refuse or fail to complete the remaining Work within the Contract Time or any proper extension thereof granted by OWNER, CONTRACTOR shall pay

OWNER Three Thousand Five Hundred dollars ($3,500.00) for each calendar day that expires after the time specified in paragraph 4.02 above for completion and readiness for final payment until the Work is completed and ready for final payment.

3. If CONTRACTOR shall neglect, refuse or fail to complete the remaining Work by August 31, 2023, CONTRACTOR shall pay OWNER Four Thousand dollars ($4,000.00) for each calendar day that expires after August 31, 2023.

ECF No. 50-2 at 3–4.

Under paragraph 4.02, SJ Louis was contracted to achieve Substantial Compliance by March 23, 2022. The City later approved CORs submitted by SJ Louis and granted SJ Louis twenty-one additional days with respect to CP5, extending its deadline to achieve Substantial Completion to April 13, 2022. The City asserts that, based on the CORs the City approved with respect to CP5, SJ Louis's deadline to achieve Final Completion was June 12, 2022. The City further asserts that SJ Louis has not achieved Final Completion with respect to CP5.

### 3.2.3  CP6 Contract

The CP6 Contract provides:

4.02  Days to Achieve Substantial Completion and Final Payment

A. The Work will be substantially completed within 660 calendar days after the date when the Contract Times commence to run as provided in . . . the General Conditions, and completed and ready for final payment . . . within 720 calendar days after the date when the Contract Times commence to run.

4.03    Liquidated Damages

A.  CONTRACTOR [SJ Louis] and OWNER [the City] recognize that time is of the essence of this Agreement and that OWNER will suffer financial loss if the Work is not completed within the times specified in paragraph 4.02 above plus any extensions thereof allowed in accordance with Article 11 of the General Conditions. They also recognize the delays, expense and difficulties involved in proving in a legal or arbitration proceeding the actual loss suffered by OWNER if the Work is not completed on time. Accordingly, instead of requiring any such proof, OWNER and CONTRACTOR agree that as liquidated damages for delay (but not as a penalty) CONTRACTOR shall pay OWNER the amounts listed below.

1.  Three Thousand Seven Hundred dollars ($3,700.00) for each calendar day that expires after the time specified in paragraph 4.02 above for Substantial Completion until the Work is substantially complete.

2.  After Substantial Completion, if CONTRACTOR shall neglect, refuse or fail to complete the remaining Work within the Contract Time or any proper extension thereof granted by OWNER, CONTRACTOR shall pay OWNER Three Thousand Five Hundred dollars ($3,500.00) for each calendar day that expires after the time specified in paragraph 4.02 above for completion and readiness for final payment until the Work is completed and ready for final payment.

3.  If CONTRACTOR shall neglect, refuse or fail to complete the remaining Work by August 31, 2023, CONTRACTOR shall pay OWNER Four Thousand dollars ($4,000.00) for each calendar day that expires after August 31, 2023.

ECF No. 50-3 at 4.

Under paragraph 4.02, SJ Louis was contracted to achieve Substantial Compliance by April 22, 2022. The City later approved CORs submitted by SJ Louis and granted SJ Louis ninety-four additional days with respect to CP6, extending its deadline to achieve Substantial Completion to July 25, 2022. The City asserts that, based on the CORs the City approved with respect to CP6, SJ Louis's deadline to achieve Final Completion was September 23, 2022. The City further asserts that SJ Louis has not achieved Final Completion with respect to CP6.

### 3.2.4 Facts Applicable to All Contract Packages

The City was responsible for setting these liquidated damages rates and they were included in the respective Contract Packages, meaning companies that chose to submit bids had to agree to those rates.

In May 2019, the City's engineer, G&H, performed an analysis to estimate the costs the City would incur as a result of any delays in achieving Substantial Completion or Final Completion with respect to CP2 (which includes CP2B), CP3 (which SJ Louis was not involved with), CP5, and CP6.

The General Conditions applicable to each of the Contract Packages define "Substantial Completion" as

> [t]he time at which the Work (or specified part thereof) has progressed to the point where, in the opinion of Engineer [G&H],[3] the Work (or specified part thereof) is sufficiently complete, in accordance with the Contract Documents, so that the Work (or specified part thereof) can be utilized for the purposes for which it is intended.

---

[3]Each of the Contract Packages names G&H as the Engineer. ECF No. 50-1 at 4; ECF No. 50-2 at 3; ECF No. 50-3 at 3.

ECF No. 50-4 at 11. The General Conditions do not explicitly define Final Completion but do discuss final inspection and final payment. *Id.* at 66–67.

The City asserts that SJ Louis achieved Substantial Completion of each Contract Package on the following dates:

- October 9, 2023 for CP2B;

- December 4, 2023 for CP5; and

- December 4, 2023 for CP6.[4]

Accordingly, as of these dates, the City was able to utilize the Projects for each of their intended purposes.

The City asserts that it has incurred, and continues to incur, substantial costs as a result of SJ Louis's failure to achieve Final Completion on schedule with respect to any of the Contract Packages, and at this time does not yet know what its total costs related to any claimed delays to Final Completion will be. The City estimates in the parties' statement of disputed facts that, between July 31, 2022 and March 31, 2025, it had incurred more than $5.6 million in costs due to SJ Louis's failure to achieve Final Completion on the Contract Packages. ECF No. 45 at 3 (citing ECF No. 48 (declaration of David Duchniak)). SJ Louis disputes this amount of damages because "the City has not presented any documentary evidence, such as invoices, bills, etc., to justify [it]." *Id.* "Rather," SJ Louis argues, "the City's assertion is only supported by a declaration of an individual who has yet to be deposed." *Id.*

The City and the State of Wisconsin are parties to a stipulated judgment that was entered by the Waukesha County Circuit Court on April

---

[4]SJ Louis asserts that Substantial Completion on the various Contract Packages occurred earlier than these dates, but for purposes of its summary judgment motion, uses only these dates.

8, 2009, in Case No. 2009CX004 (the "Stipulated Judgment"). The Stipulated Judgment was amended in July 2017 ("the Amended Stipulated Judgment") to reflect the fact that the City had obtained an approved diversion of Great Lakes water to be used as its water supply for its residents.

The Amended Stipulated Judgment required development of an interim radium treatment system, broken down into Phase I and Phase II. Phase II only needed to be initiated if the City's water diversion project manager and construction manager could not certify, by May 1, 2022, that all of the Great Lakes water diversion project was under construction and 50% complete.

Under the Stipulated Judgment, the City was required to achieve compliance with all federal and state drinking water radionuclide standards by June 30, 2018. Under the Amended Stipulated Judgment, that date was changed from June 30, 2018 to September 1, 2023.

The Amended Stipulated Judgment defines "Phase II" of the Project as "final approval, bid[ding], and construction" of the interim radium treatment system. ECF No. 50 at 10. The Amended Stipulated Judgment required the City to have completed Phase II, if initiated, no later than September 1, 2023.

On January 24, 2024, pursuant to the Stipulated Judgment, the City informed the Wisconsin Department of Natural Resources that the transition to Lake Michigan water was complete as of October 9, 2023. On February 29, 2024, the Stipulated Judgment was fully satisfied and the related case was closed.

### 3.3 Facts Pertaining to HDD Design

#### 3.3.1 Background

On October 24, 2016, the City contracted G&H as the Program Manager and Construction Manager for the Program. The Contract Packages constitute public construction projects and are design-bid-build projects, in which bidders submitted bids based on the plans and specifications supplied by the City. Bid documents (and the Contract Packages, *supra* note 3), state that G&H is the Engineer.

The Notice to Bidders supplied to potential bidders for the Contract Packages states: "The letting of the work described herein is subject to the provisions of Sec. 62.15, 66.0901, 778.14, and 779.15, Wisconsin Statutes, and all other relevant provisions of federal, state, and local law." ECF No. 50 at 11.

The City supplied Contract Drawings in the bid process, which showed a proposed pathway for each HDD, including HDD 6.8.[5]

#### 3.3.2 Relevant Contract Provisions

Section 7.01.A of the General Conditions states: "Contractor shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction." ECF No. 50-4 at 33.

Article 7.19 of the General Conditions, "Delegation of Professional Design Services," provides:

> A. Contractor will not be required to provide professional design services unless such services are specifically required by the Contract Documents for a portion of the Work or unless such services are required to carry out

---

[5]The parties submitted an excerpt of the CP6 Contract Drawings depicting the pathway for HDD 6.8. ECF No. 50-5.

Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. . . .

B. If professional design services or certifications by a design professional related to systems, materials, or equipment are specifically required of Contractor by the Contract Documents, Owner and Engineer will specify all performance and design criteria that such services must satisfy. Contractor shall cause such services or certifications to be provided by a properly licensed professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, and other submittals prepared by such professional. . . .

D. Pursuant to this paragraph, Engineer's review and approval of design calculations and design drawings will be only for the limited purpose of checking for conformance with performance and design criteria given and the design concept expressed in the Contract Documents.

ECF No. 50-4 at 44–45.

The Contracts include, in a Specification Book, Section 33 05 22, which refers to HDD.[6] That section requires the Contractor to do the following, among other things:

A. Provide pipe installed via HDD to the line and grade and within the right-of-way or easements as shown or specified.

1. Take responsibility for the design and adequacy of HDD installation details and methods not shown or specified.

---

[6]The parties submitted this specification only as applied to CP5, *see* ECF No. 50-19 at 1–3, but because they agree that it applies to each of the Contract Packages, ECF No. 50 at 12–13. The Court will assume the same. The Court will do the same for the other specifications that the parties have referenced, *id.* at 4–6, and which are discussed *infra* Section 3.5.

2. Rock, including cobbles, boulders, bedrock, and other similar materials have the potential of being encountered along the pipeline alignment. Assure the practicality and feasibility of the HDD installation method based on the available soil and subsurface data. Take responsibility for obtaining additional soil and subsurface data through borings, test pits, or other means along the pipe alignment necessary to design the proposed HDD installation. The presence of rock, including cobbles, boulders, bedrock, and other adverse subsurface conditions will not warrant an increase in the Total Computed Price.

3. Determine zone of influence, safe burial depth, and offset from existing utilities while considering drilling fluid pressure, drilling equipment, existing utility materials, and soil conditions. Assure that alignment shown provides sufficient burial depth and offset to prevent leakage to adjacent utilities or surface, or propose modifications to alignment in submittals.

ECF No. 50-19 at 1. Section 33 05 22 further requires SJ Louis to provide a "certificate signed and sealed by a Licensed Professional Engineer experienced in HDD" certifying that that engineer "has evaluated and approved the CONTRACTOR's HDD plan and has prepared complete design calculations and working drawings for the HDD, not specifically shown on the drawings." *Id.* at 2.

Part 3.1 of Section 33 05 22, titled Execution: Installation, states in relevant part that SJ Louis shall "[p]erform HDD as determined by [its] Licensed Professional Engineer registered in the State of Wisconsin, as recommended by the pipe and equipment manufacturers, and in conformance with the Horizontal Directional Drilling, Good Practices Guidelines by the HDD Consortium and ASTM F1962." ECF No. 50 at 14.

### 3.4 Facts Pertaining to Baseline Schedule

#### 3.4.1 Relevant Contract Provisions

Each Contract Package states:

**ARTICLE 7 – CONTRACTOR'S REPRESENTATIONS**

7.01 In order to induce OWNER to enter into this Agreement CONTRACTOR makes the following representations:

E. CONTRACTOR has obtained and carefully studied (or assumes responsibility for having done so) all additional or supplementary examinations, investigations, explorations, tests, studies and data concerning conditions (surface, subsurface and Underground Facilities) at or contiguous to the Site which may affect cost, progress, or performance of the Work or which relate to any aspect of the means, methods, techniques, sequences and procedures of construction to be employed by CONTRACTOR, including applying the specific means, methods, techniques, sequences and procedures of construction, if any, expressly required by the Contract Documents to be employed by CONTRACTOR, and safety precautions and programs incident thereto.

ECF No. 50-1 at 7; ECF No. 50-2 at 6; ECF No. 50-3 at 7. As noted *supra* Section 3.3.2, Section 7.01.A of the General Conditions similarly states: "Contractor shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction." ECF No. 50-4 at 33.

The General Conditions applicable to all of the Contracts include the following provisions:

**ARTICLE 4 – COMMENCEMENT AND PROGRESS OF THE WORK**

. . .

*4.05    Delays in Contractor's Progress*

A.  If Owner, Engineer, or anyone for whom Owner is responsible, delays, disrupts, or interferes with the performance or progress of the Work, then Contractor shall be entitled to an equitable adjustment in the Contract Times and Contract Price. Contractor's entitlement to an adjustment of the Contract Times is conditioned on such adjustment being essential to Contractor's ability to complete the Work within the Contract Times.

B.  Contractor shall not be entitled to an adjustment in Contract Price or Contract Times for delay, disruption, or interference caused by or within the control of Contractor. Delay, disruption, and interference attributable to and within the control of a Subcontractor or Supplier shall be deemed to be within the control of Contractor.

ECF No. 50-4 at 18.

**ARTICLE 7 – CONTRACTOR'S RESPONSIBILITIES**

*7.01    Supervision and Superintendence*

A.  Contractor shall supervise, inspect, and direct the Work competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to perform the Work in accordance with the Contract Documents. Contractor shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction.

B.  At all times during the progress of the Work, Contractor shall assign a competent resident superintendent who shall not be replaced without written notice to Owner and Engineer except under extraordinary circumstances.

*Id.* at 33.

**ARTICLE 8 – OTHER WORK AT THE SITE**

*. . .*

*8.03    Legal Relationships*

A. If, in the course of performing other work at or adjacent to the Site for Owner, the Owner's employees, any other contractor working for Owner, or any utility owner causes damage to the Work or to the property of Contractor or its Subcontractors, or delays, disrupts, interferes with, or increases the scope or cost of the performance of the Work, through actions or inaction, then Contractor shall be entitled to an equitable adjustment in the Contract Price or the Contract Times, or both. Contractor must submit any Change Proposal seeking an equitable adjustment in the Contract Price or the Contract Times under this paragraph within 30 days of the damaging, delaying, disrupting, or interfering event. The entitlement to, and extent of, any such equitable adjustment shall take into account information (if any) regarding such other work that was provided to Contractor in the Contract Documents prior to the submittal of the Bid or the final negotiation of the terms of the Contract. When applicable, any such equitable adjustment in Contract Price shall be conditioned on Contractor assigning to Owner all Contractor's rights against such other contractor or utility owner with respect to the damage, delay, disruption, or interference that is the subject of the adjustment. Contractor's entitlement to an adjustment of the Contract Times is conditioned on such adjustment being essential to Contractor's ability to complete the Work within the Contract Times.

*Id.* at 46.

**ARTICLE 9 – OWNER'S RESPONSIBILITIES**

. . .

*9.09    Limitations on Owner's Responsibilities*

. . .

   C. The Owner shall not supervise, direct, or have control or authority over, nor be responsible for, Contractor's means, methods, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of Contractor to comply with Laws and Regulations applicable to the performance of the Work. Owner will not be responsible for Contractor's failure to perform the Work in accordance with the Contract Documents.

*Id.* at 48.

**ARTICLE 10 – ENGINEER'S STATUS DURING CONSTRUCTION**

. . .

*10.08   Limitations on Engineer's Authority and Responsibilities*

. . .

   B. Engineer will not supervise, direct, control, or have authority over or be responsible for Contractor's means, methods, techniques, sequences, or procedures of construction, or the safety precautions and programs incident thereto, or for any failure of Contractor to comply with Laws and Regulations applicable to the performance of the Work. Engineer will not be responsible for Contractor's failure to perform the Work in accordance with the Contract Documents.

*Id.* at 50.

Each Contract Package states that the "Resident Project Representative shall not . . . [a]dvise on, issue directions relative to, or

assume control over any aspect of the means, methods, techniques, sequences or procedures of Contractor's work." ECF No. 50 at 20.

### 3.4.2   SJ Louis's CORs

In discovery, the City sought SJ Louis's mathematical calculation for the total amount of alleged damages. SJ Louis responded, in part, that its "CORs and Claim Letters . . . provide [the] calculation of its damages during the Projects, including related backup documents supporting those calculations." ECF No. 50 at 16.

SJ Louis submitted the following CORs, supported by claim letters, for extra contract time and/or price because it asserts that it was not able to perform its work consistent with its baseline schedules due to delays, disruptions, or interferences for which it claims the City was responsible.

The City believes that SJ Louis's CORs demonstrate that they are based on deviations from SJ Louis's baseline schedule and show that SJ Louis was seeking increases in contract time or price for issues within its control or responsibility, and for which it was not entitled to increases under the relevant Contracts. ECF No. 45 at 2. SJ Louis responds that it does not claim that it is entitled to additional compensation *merely* because it was not able to perform as set forth in its baseline schedule. *Id.* at 1. Rather, it claims entitlement to additional compensation because its work was impacted by design changes, unavailable permits, and other compensable issues. *Id.* The deviation from its baseline schedule demonstrates the impact of these compensable issues and is a reasonable measure of its damages. *Id.*

### 3.4.2.1   CP2B COR 22, CP5 COR 36, and CP6 COR 50

Between March and April 2024, SJ Louis submitted CORs related to each of the Contract Packages.

CP2B COR 22 sought a $66,617 increase in the contract price and three days in additional contract time because "SJ Louis experienced cost and time impacts to its pipe installation when mobilizing to additional locations not detailed in its baseline schedule, . . . which could not have been anticipated." ECF No. 50-9 at 1. SJ Louis's claim related to this COR states that

> to the extent that the additional mobilizations are related to previously denied CORs, those CORs and related claims were wrongfully denied by B&V and the GWA for the reason stated in SJ Louis's prior correspondence on those issues. The mobilizations incurred by SJ Louis were the direct result of the GWA's numerous changes, delays, and interference on the Project that prevented SJ Louis from performing its work in its planned sequence. Instead, in order to keep the Project moving forward, SJ Louis was forced to perform additional mobilizations, hop scotching around the Project in order to find areas that it could perform Work. These additional mobilizations were made necessary by the GWA's continued refusal to grant SJ Louis time extensions, to which it was entitled, throughout the course of the Project. These mobilizations were not caused by any SJ Louis delay or otherwise within SJ Louis's control as alleged by B&V.

ECF No. 50-10 at 1–2.

CP5 COR 36 sought a $330,906 increase in the contract price and sixteen days in additional contract time for the same reasons. ECF No. 50-11 at 1; ECF No. 50-12 at 1–2.

CP6 COR 50 sought a $380,126 increase in the contract price and twenty days in additional contract time for the same reasons. ECF No. 50-17 at 1; ECF No. 50-18 at 1–2.

In CP2B COR 22, SJ Louis states that it incurred costs for three additional unplanned mobilizations because numerous areas of the project

were not available for work due to issues for which SJ Louis was not responsible. The same COR states the following: first, between October 20, 2021, and October 25, 2021, SJ Louis was unable to continue with pipe installation as planned because the City of Muskego was erroneously withholding a permit, which prevented SJ Louis from working as planned; second, between October 7, 2022, and May 24, 2023, SJ Louis was unable to continue working on Ryan Road because of structural flaws in the HDD 6.8 directional drill design; finally, between April 29, 2023, and May 1, 2023, SJ Louis was forced to mobilize from West Ave to Les Paul Parkway to continue with pipe installation. The COR states that these mobilizations would not have occurred had SJ Louis been able to work unimpeded by late permits and design issues.

In CP5 COR 36, SJ Louis states that it incurred costs due to 16 additional mobilizations that were unplanned and were caused by issues for which SJ Louis was not responsible. The same COR states that each of the mobilizations set forth therein occurred because SJ Louis's work was impacted by issues beyond its control.

In CP6 COR 50, SJ Louis states that SJ Louis incurred costs due to 16 additional mobilizations that were unplanned and were caused by issues for which SJ Louis was not responsible. In the COR, SJ Louis states that each of the mobilizations set forth therein occurred because SJ Louis's work was impacted by issues beyond its control.

### 3.4.2.2 CP5 COR 37

Between May and July 2024, SJ Louis submitted COR 37 related to CP5, seeking a $710,227 increase in the contract price. In support of this request, it stated:

> SJ Louis created the July 1, 2020, . . . GWA[] approved and achievable baseline schedule that projected SJ Louis to install open cut pipe in a continuous, uninterrupted fashion through both rural and suburban areas. SJ Louis actually installed the open cut pipe in a scattered, interrupted fashion because of the following, non-exhaustive list of compensable reasons, causing labor productivity loss for which SJ Louis is entitled to be compensated.
>
> 1. Design changes
> 2. The GWA's untimely response to SJ Louis's submittals and RFIs
> 3. Lack of available work areas
> 4. Unanticipated groundwater
> 5. Underground utilities not shown or indicated on the construction Drawings, or not shown or indicated within reasonable accuracy on the construction Drawings
> 6. Constructive acceleration
>
> The GWA understood that SJ Louis planned to have one crew install all the open cut pipe on CP5.

ECF No. 50-13 at 1.

SJ Louis used its baseline schedule to calculate its productivity loss factor. *Id.* at 2. It continued to rely on the productivity it assumed in its baseline schedule in its July 2024 claim, stating that it "is entitled to the difference between its assumed productivity, and its actual productivity." ECF No. 50-14 at 2. It pointed to its baseline schedule to rebut B&V's argument regarding its productivity during its first month of pipe installation, asserting that its "baseline schedule takes this into account – the first month of work reflected in that schedule assumed lower labor productivity than work performed later." *Id.*

SJ Louis states that it submitted this COR to recover the costs it incurred as a result of several impacts to its work, which were beyond its control and compensable under the contract. The COR states that SJ Louis's work was impacted by several compensable issues, including design changes, unanticipated utilities, and missing permits. The COR further states that these issues reduced the productivity of its crews. The COR states that the workers on the additional crews had not previously worked together, requiring a learning curve to absorb work procedures, affecting labor rhythm and reducing productivity.

The COR further states that design changes, the GWA's untimely responses to submittals and RFIs, the lack of available work areas, and unanticipated field conditions forced SJ Louis's crews to start and stop work and mobilize and demobilize many more times than planned. It states that this also forced SJ Louis to move workers on and off crews, in order to try to best utilize employees' abilities and talents. It states that this created labor fatigue, which not only lowered morale and attitude, but further affected labor rhythm and reduced productivity. It states that these compensable labor impacts also diverted supervision from the original construction plan and forced them to analyze design changes on the fly, stop and re-plan affected work areas, and modify instructions provided to workers in the field. It states that all of these compensable impacts had a cumulative, synergistic, negative impact on productivity.

### 3.4.2.3    CP6 COR 43

Between October and December 2023, SJ Louis submitted COR 47 related to CP6, seeking ninety-seven days in additional contract time. In support of this COR, it stated that it waited to start pipe installation in earnest when more work became available, as at the time it was initially

ready to start installing critical pipe, "there were too few locations available at the time for [it] to perform its work in a cost-effective, continuous, uninterrupted fashion as planned in the GWA-approved July 1, 2020 baseline schedule." ECF No. 50-15 at 1. It continued to rely on its baseline schedule in defending its delayed start:

> First, the GWA claims that SJ Louis spent significantly longer than planned mobilizing to the site and completing preparation work to begin pipe installation. It claims this mobilization and preparation work, not lack of available work, is responsible for the majority of the delay. This is not the case. In fact, the time spent (and reflected in the claim) mobilizing to the site and completing preparation work is exactly the same as planned in SJ Louis's baseline schedule for CP6. Specifically, SJ Louis's GWA-approved baseline schedule for CP 6 data dated July 1, 2020 shows that the GWA issued NTP on July 1, 2020 . . . and during the next four months, or 124 calendar days (July through October 2020), SJ Louis planned to create on-site work plans, fabricate materials, mobilize equipment, clear and grub, and locate site utilities in preparation to start open cut pipe installations on or about November 2, 2020 . . . . If the GWA had reviewed SJ Louis's schedule before sending its response, this would have been obvious.
>
> . . .
>
> Fifth, the GWA takes issue with SJ Louis's statement that its work was constructively accelerated because SJ Louis failed to achieve Substantial Completion by the originally scheduled completion dates. I assure you that SJ Louis did indeed accelerate its work. SJ Louis added open-cut and HDD crews, beyond what was forecasted in the baseline schedule, in an attempt to overcome this and other delays suffered on the Project. As a result, SJ Louis finished its work sooner than it would otherwise have been able to do. However, as we have pointed out in previous correspondence, the magnitude of delays was such that it was impossible to overcome them completely. SJ Louis is entitled to payment for the acceleration efforts it undertook and an increase in the

Contract Time for those delays it could not overcome. In other words, GWA's claim that it must be one or the other is too simplistic. And for the same reason, GWA's accusation of "double dipping" and "not acting in good faith" is entirely unwarranted.

ECF No. 50-16 at 1, 3.

In the COR, SJ Louis states that it was unable to work productively and was delayed due to several factors, including the fact that its work was pushed into winter conditions, rendering pavement installation impossible; a design change from HDD 6.1 to open-cut; missing permits; and defective HDD designs. *See* ECF No. 50-15 at 4 (attributing delays to "the fact that the GWA had not obtained permits for SJ Louis to install pipe" and "the GWA modified its design which thereby placed SJ Louis's pipe installation on hold").

### 3.5    Facts Pertaining to Averages

SJ Louis submitted numerous CORs, supported by claim letters, seeking extra contract price and time for work done, with the extra time and/or price being based, in part, on "average" work hours, rates, and crew sizes.

Article 11.06A.1 of the of the General Conditions applicable to each of the Contract Packages, titled "Change Proposals," states:

Procedures: . . . The Contractor shall submit supporting data, including the proposed change in Contract Price or Contract Time (if any), to the Engineer and Owner within 15 days after the submittal of the Change Proposal. The supporting data shall be accompanied by a written statement that the supporting data are accurate and complete, and that any requested time or price adjustment is the entire adjustment to which Contractor believes it is entitled as a result of said event.

ECF No. 50-4 at 53. Article 12.01B of the same, titled "Claims," states:

> Submittal of Claim: . . . The responsibility to substantiate a Claim shall rest with the party making the Claim. In the case of a Claim by Contractor seeking an increase in the Contract Times or Contract Price, or both, Contractor shall certify that the Claim is made in good faith, that the supporting data are accurate and complete, and that to the best of Contractor's knowledge and belief the amount of time or money requested accurately reflects the full amount to which Contractor is entitled.

*Id.* at 54. Article 13.01 of the same, titled "Cost of the Work," states:

> A.  Purposes for Determination of Cost of the Work: The term Cost of the Work means the sum of all costs necessary for the proper performance of the Work at issue, as further defined below. The provisions of this Paragraph 13.01 are used for two distinct purposes:
>
> . . .
>
> 2.  To determine the value of a Change Order, Change Proposal, Claim, set-off, or other adjustment in Contract Price. When the value of any such adjustment is determined on the basis of Cost of the Work, Contractor is entitled only to those additional or incremental costs required because of the change in the Work or because of the event giving rise to the adjustment.
>
> . . .
>
> E.  Documentation: Whenever the Cost of the Work for any purpose is to be determined pursuant to this Article 13, Contractor will establish and maintain records thereof in accordance with generally accepted accounting practices and submit in a form acceptable to Engineer an itemized cost breakdown together with supporting data.

*Id.* at 55. The Contract Packages further include Specification Book 01 50 00, "Construction Facilities and Temporary Controls," which specifies in subsection 1.7B, "Public Utility Installations and Structures,"

2.  The Contract Documents contain data relative to existing public utility installations and structures above and below the ground surface. Existing public utility installations and structures are indicated on the Drawings only to the extent such information was made available to, or found by, the ENGINEER in preparing the Drawings. These data are not guaranteed for completeness or accuracy, and the CONTRACTOR is responsible for making necessary investigations to become fully informed as to the character, condition, and extent of all public utility installations and structures that may be encountered and that may affect the construction operations.

3.  Contact utility locating service sufficiently in advance of the start of construction to avoid damage to the utilities and delays to the completion date. Call diggers hotline at (811) or (800) 242-8511 72 hours in advance of work to obtain the location of existing underground utilities to avoid damage to the utilities and delays to the completion date. Provide 72 hours' notice prior to the start of work in those areas to a designated locating service, utilities, governmental agencies and others reasonably assumed to have above and below ground utilities within the limits of construction. Excavation work shall not commence in any area where underground utilities have not been located.

4.  Remove, replace, relocate, repair, rebuild, and secure any public utility installations and structures damaged as a direct or indirect result of the Work under this Contract. Costs for such work are incidental to the Contract. Contractor will be responsible and liable for any consequential damages done to or suffered by any public utility installations or structures. Assume and accept responsibility for any injury, damage, or loss which may result from or be consequent to interference with, or interruption or discontinuance of, any public utility service.

ECF No. 50-19 at 4–5. The Contract Packages also include Specification Book 31 23 16, "Excavation," which specifies in subsection 1.4C, "Site Conditions": "Underground Utilities: Locate and identify existing underground utilities prior to the commencement of Work a minimum of 2,000 linear feet ahead of pipe laying operations." *Id.* at 6.

## 4. ANALYSIS

Each party moves for partial summary judgment on discrete legal issues, also noting that this case presents many other questions that cannot be resolved at this time as a matter of law. ECF No. 44 at 2 ("[T]he vast majority of issues in this complex case will need to be tried . . . ."); ECF No. 52 at 2 ("Although construction litigation is frequently fact-intensive and difficult to address on summary judgment, in the current dispute there are two issues which demonstrate, as a matter of law, SJ Louis's refusal to accept its own contractual responsibilities . . . ." (emphasis omitted)).

SJ Louis presents the following issues for summary judgment. First, SJ Louis argues that the Contract provisions for liquidated damages due to failure to timely achieve Final Completion on the Projects are unreasonable and "invalid as a matter of law." ECF No. 44 at 2, 5–12. Second, SJ Louis seeks a determination that it had no contractual design responsibility for the HDD pathways on CP5 and CP6 because "the City had no legal authority" under Wisconsin public procurement law "to impose design responsibility for HDDs on SJ Louis." *Id.* at 3. As further developed in the briefing, SJ Louis alternatively argues that "the City is misreading the Contract to impose design responsibility on SJ Louis." *Id.* at 3 n.1.

The City presents the following issues for summary judgment. First, it argues that the plain language of the Contracts makes SJ Louis solely responsible "for managing its [baseline] schedule," therefore SJ Louis "is

not entitled to any increase in Contract Time or Contract Price due to its inability to comply with its schedule" and cannot recover on this basis. ECF No. 52 at 2–3. Second, it argues that SJ Louis cannot, under the Contracts, rely on averages to substantiate its CORs and therefore is not entitled to increases in Contract Time or Contract Price on those CORs. *Id.*

The parties appear to agree that Wisconsin law controls the issues raised in both motions. *See* ECF No. 44 at 5–7, 14–17, 18–19 (citing Wisconsin law); *id.* at 14–17, 18–19 (same); ECF No. 53 at 3 n.2 ("SJ Louis has tacitly acknowledged that this is a determination based on Wisconsin law." (citations omitted)); ECF No. 52 at 4–5, 14 (citing Wisconsin law); ECF No. 54 at 2, 5, 14 (same). The Court has no basis to disagree and will apply Wisconsin law throughout.

Each motion raises distinct issues which can be addressed independently of one another, so the Court addresses the motions in the order in which they were filed: first SJ Louis's, then the City's. For the reasons stated below, both motions will be denied in full.

### 4.1  SJ Louis's Motion for Summary Judgment

#### 4.1.1  Final Completion Liquidated Damages

A liquidated damages provision in a contract must be reasonable to be valid and enforceable. *See Kernz v. J.L. French Corp.*, 667 N.W.2d 751, ¶¶ 28, 30 (Wis. 2003) ("[W]e use the term 'stipulated damages' to mean the damages specified in the contract, and 'liquidated damages' to mean reasonable and enforceable stipulated damages. . . . 'A stipulated damages provision will be enforced if it is reasonable under the totality of the circumstances.'" (first quoting *Wassenaar v. Panos*, 331 N.W.2d 357, 359

(Wis. 1983) then quoting *Westhaven Assocs. Ltd. v. C.C. of Madison, Inc.*, 652 N.W.2d 819, ¶ 17 (Wis. Ct. App. 2002))).[7]

"The [C]ourt looks at several factors to determine reasonableness: '(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the [liquidated] damages a reasonable forecast of the harm caused by the breach?'" *Id.* ¶ 30 (quoting *Wassenaar*, 331 N.W.2d at 363). "The factors are not meant to be mechanically applied, and courts may give some factors greater weight than others." *Id.* (quoting *Westhaven*, 652 N.W.2d ¶ 17); *see also Koenings v. Joseph Schlitz Brewing Co.*, 377 N.W.2d 593, 600 (Wis. 1985) ("These factors are neither exclusive nor necessarily conclusive of the reasonableness of a stipulated damages clause."). Ultimately, though, the Court assesses reasonableness under the totality of the circumstances, including consideration of the policies favoring and disfavoring liquidated damages. *Wassenaar*, 331 N.W.2d at 361–62 (footnote omitted).

---

[7]SJ Louis uses the terms "stipulated" and "liquidated" damages interchangeably. *See* ECF No. 44 at 5–12. As the cited portion of *Kernz* shows, the term "liquidated" presupposes the reasonableness of the damages clause, which is very much at issue here. Nevertheless, because the parties have used "liquidated damages" in their fact statements, *see* ECF No. 45 at 3–10 and ECF No. 50 at 3, and the Contracts themselves refer to "Liquidated Damages," *see supra* Sections 3.2.1–3.2.3, the Court will use that term—although imprecise—throughout this Section.

In any event, "subjective intent has little bearing on whether [a stipulated or liquidated damages] clause is objectively reasonable," and "[t]he label the parties apply to the clause, which might indicate their intent, has some evidentiary value, but it is not conclusive." *Wassenaar*, 331 N.W.2d at 363 (citing *Seeman v. Biemann*, 84 N.W. 490, 492 (Wis. 1900)). Thus, the exact terminology applied to the provision at issue is of minor importance to the analysis here.

The Court employs a "prospective-retrospective approach in determining the reasonableness of the [liquidated] damages clause[], . . . look[ing] at the harm anticipated at the time of contract formation and the actual harm at the time of breach (or trial)." *Id.* at 364 (citing *Fields Found., Ltd. v. Christensen*, 309 N.W.2d 125, 131 (Wis. Ct. App. 1981) and *Seeman*, 84 N.W. at 492). The second and third factors of the reasonableness test are "intertwined" and the prospective-retrospective approach applies to both. *Westhaven*, 652 N.W.2d ¶ 23 (quoting *Wassenaar*, 331 N.W.2d at 364).

When, as in the present case, "neither party complains of inequity in bargaining power, the party seeking to avoid a [liquidated] damages provision bears both the burden of proving facts which would justify the trial court's concluding that the clause should not be enforced and the burden of persuading the court that the provision should not be enforced." *Kernz*, 667 N.W.2d ¶ 31 (quoting *Westhaven*, 652 N.W.2d ¶ 18) (internal quotation marks omitted).[8]

SJ Louis's argument that the Final Completion liquidated damages provisions in the Contracts are invalid hinges on the fact that, for each Contract, the liquidated damages *increase* on a certain date even after Substantial Completion of the Projects. ECF No. 44 at 7–10; *supra* Sections 3.2.1–3.2.3 (detailing amounts). It argues that "[t]here is simply no credible scenario in which the City's estimated damages could increase after the

---

[8]SJ Louis notes that "[t]he City was responsible for setting these liquidated damages rates" and the rates "had to be accepted by the bidders as a condition of bidding and could not be negotiated." ECF No. 44 at 8. If it referenced this fact to demonstrate an inequity of bargaining power, it failed to develop any related legal argument in its brief. *See id.* at 5–12. Accordingly, any such argument is waived. *Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2020) ("[A]rguments not raised in an opening brief are waived." (citing *Lisle v. Welborn*, 933 F.3d 705, 722 n.4 (7th Cir. 2019))).

Projects could be used," i.e., at the point of Substantial Completion but before Final Completion. ECF No. 44 at 9 (emphasis omitted). Therefore, in SJ Louis's view, the increased liquidated damages for failure to timely achieve Final Completion "are nothing more than an illegal penalty intended to incentivize SJ Louis to complete the work, as opposed to a reasonable estimate of the damages the City would suffer if SJ Louis failed to do so." *Id.* at 9–10; *see also id.* at 7 (arguing that the Final Completion liquidated damages were "inherently unreasonable at the time of contracting").

The City responds, first, that summary judgment is inappropriate because the factual record is not sufficiently developed to complete the full reasonableness analysis. ECF No. 53 at 4. It argues that the undisputed facts satisfy at least the part of the test that requires prospective reasonableness of the Final Completion liquidated damages at the time of contracting. *Id.* at 5. It further argues that, because SJ Louis has not yet reached Final Completion on the Projects, the factual record at this time cannot permit a conclusive finding on the retrospective reasonableness of its Final Completion liquidated damages, with the caveat that "the current record already suggests that [its] liquidated damages reasonably reflect [its] actual harm." *Id.*

As a threshold matter, the Court agrees with the City that SJ Louis's analysis is incomplete. SJ Louis makes much of the Contracts' overall liquidated damages scheme but has little to say about "the *relationship* of anticipated and actual harm to the stipulated amount of damages," which is the "touchstone of . . . reasonableness under the totality of the circumstances test." *Koenings*, 377 N.W.2d at 604 (emphasis added). SJ Louis focuses heavily on what the parties agreed to: the stipulated amounts of

damages in the Contracts. ECF No. 58 at 4 ("[T]his one fact definitively establishes that the liquidated damages rate[s] associated with Final Completion are inherently unreasonable."). But it provides no legal authority to demonstrate that this single fact can decide the analysis, and it fails to compare, as required, what the parties agreed to versus those damages that could have been predicted at the time of contracting and those damages that the City is now attempting to prove.

SJ Louis criticizes the City for demanding too much, arguing that Wisconsin law does not require treating each of the reasonableness factors "as [a] separate test," each of which it must "overcome." *Id.* at 3. True, the test looks to the totality of the circumstances, and the reasonableness factors are neither exclusive nor conclusive. *Kernz*, 667 N.W.2d ¶ 30 (citation omitted); *Koenings*, 377 N.W.2d at 600. Still, Wisconsin courts tend to proceed through all three factors. *See, e.g.*, *Kernz*, 667 N.W.2d ¶¶ 32–46; *Westhaven*, 652 N.W.2d ¶¶ 19–34; *Koenings*, 377 N.W.2d at 600–03. The City is right to expect SJ Louis to do the same. The Court will unpack the remainder of the parties' arguments using the three-factor framework articulated in Wisconsin case law to organize its analysis.

The first factor examines whether the facts suggest that the parties intended to contract for "damages or . . . a penalty." *Kernz*, 667 N.W.2d ¶ 30. Although this factor is "'rarely helpful' because the parties' intent has 'little relevance to what is reasonable in law,'" *id.* ¶ 32 (quoting *Koenings*, 377 N.W.2d at 600), evidence of subjective intent still has "some evidentiary value." *Wassenaar*, 331 N.W.2d at 363 (citation omitted).

Consideration of this factor could support either party's position, undermining summary judgment for SJ Louis. SJ Louis asserts in a conclusory fashion that the overall scheme of the Final Completion

liquidated damages provisions—increasing at a certain point even after the Projects became usable—demonstrates that the liquidated damages are intended to serve as a penalty. ECF No. 44 at 9–10. On the other hand, the City argues that it had a good reason for the Final Completion liquidated damages to increase after August 31, 2023: "this increase . . . tracks exactly with the timeline required under the Stipulated Judgment" by which the City had "to achieve compliance with all federal and state drinking water radionuclide standards by September 1, 2023" or else face "financial consequences." ECF No. 53 at 8 (emphasis omitted)[9]; *see supra* Section 3.2.4. SJ Louis replies that the factual record provides no support for the City's contentions about the Stipulated Judgment and financial penalties. ECF No. 58 at 5–6.

The Court disagrees with SJ Louis that the only reasonable explanation for the increase in liquidated damages after Substantial Compliance is to serve as a penalty. SJ Louis is correct that the City has not pointed to record evidence that it would face financial consequences for failure to comply with the Stipulated Judgment. But the fact that Final Completion liquidated damages increased the same day on which the City was required to be in compliance with the Stipulated Judgment supports a reasonable inference that the City intended the Final Completion liquidated damages as insurance against possible penalties it might face under the Stipulated Judgment for noncompliance (in addition to those costs it could

---

[9]The City raises this argument with respect to factor two, whether the overall liquidated damages scheme was reasonable at the time of contracting. ECF No. 53 at 8; *see also id.* at 9–10 (arguing that SJ Louis failed to address what the City's intent was at the time of contracting). However, the Court sees fit to partially examine this argument under the intent factor.

Case 2:24-cv-00272-JPS    Filed 03/31/26    Page 35 of 63    Document 63

incur from not yet having fully finished pipelines).[10] SJ Louis argues that, to justify the heightened Final Completion liquidated damages rates, "the City would have to be worse off after the Projects were in use than it was while they were still under construction," which it labels as an "obvious[ly]" "absurd[]" proposition. ECF No. 58 at 4. But as just explained, the Court can envision a scenario in which the City was in fact "worse off": if it was stuck with both incomplete pipelines *and* penalties under the Stipulated Judgment. SJ Louis points out that any penalties the City might have faced "would have only run for approximately one month," from the September 1, 2023 Stipulated Judgment compliance deadline to October 9, 2023, when the transition to Lake Michigan water was complete. ECF No. 58 at 6. True, but this does not change that the City may have been materially worse off, and at any rate this point speaks more to the actual amount of liquidated damages that the City can recover.

The Court will therefore credit the City's explanation for purposes of SJ Louis's summary judgment motion. *Bridge*, 815 F.3d at 360 (citation omitted). SJ Louis has offered nothing beyond a bare assertion of punitive intent. These competing explanations prevent the Court from finding that the parties shared any particular intent in entering contracts that included the Final Completion liquidated damages provisions.

---

[10]The City's argument is also consistent with how stipulated judgments and consent decrees generally work. *See generally Consent decree*, WIKIPEDIA, https://en.wikipedia.org/wiki/Consent_decree [perma.cc/9CMA-Q3TJ] (last visited Mar. 20, 2026) (describing use of stipulated judgments and consent decrees for environment regulatory enforcement and a party's failure to perform as agreed in the stipulated judgment can result in sanctions); *e.g.*, *United States v. Jupiter Aluminum Corp.*, No. 2:07-CV-262 PPS, 2009 WL 418091, at *3, *7–9 (N.D. Ind. Feb. 18, 2009) (discussing consent decree stipulated penalties).

The second factor in determining the reasonableness of a liquidated damages provision is whether "the injury caused by [a] breach . . . is difficult or incapable of accurate estimation at the time of contract." *Kernz*, 667 N.W.2d ¶ 30 (citation omitted). "The greater the difficulty of estimating damages or proving damages, the more likely the [liquidated] damages will appear reasonable." *Wassenaar*, 331 N.W.2d at 363 (citing *Sheffield-King Milling Co. v. Jacobs*, 175 N.W. 796, 802 (Wis. 1920)); *see also Koenings*, 377 N.W.2d at 600 ("[W]here damages are inherently difficult to determine, greater latitude will be afforded the parties in setting the amount of a stipulated damages clause."). On the other hand, "[i]f damages are readily ascertainable, a significant deviation between the stipulated amount and the ascertainable amount will appear unreasonable." *Wassenaar*, 331 N.W.2d at 363 (citing *City of Madison v. Am. Sanitary Eng'g Co.*, 95 N.W. 1097, 1105 (Wis. 1903). This factor, too, could support either party's position, undermining summary judgment for SJ Louis.

On this factor, the City asserts that it "reasonably based" the liquidated damages rates in the Contracts on estimates it solicited from G&H and that "these rates are a reasonable forecast of the harm caused if there were delays in achieving [S]ubstantial or [F]inal [C]ompletion for any of the Contract Packages." ECF No. 53 at 9; *see also supra* Section 3.2.4. Implicit in this assertion is a claim that the City's damages were "readily ascertainable," and were in fact ascertained by G&H and then memorialized in the Contracts. *Wassenaar*, 331 N.W.2d at 363 (citation omitted). SJ Louis responds first that the City's argument is circular and second (repetitively) that G&H's estimated rates cannot be a reasonable forecast of damages because they increase after the Projects are available for use. ECF No. 58 at 6.

As already discussed, compliance with the Stipulated Judgment provides a viable alternative explanation for why the Final Completion liquidated damages rates might have increased after August 31, 2023, so SJ Louis's second argument falls flat. Its first argument—that the City cannot "stat[e] that simply because the analysis [of forecasted damages] was performed [by G&H], the rates are *per se* reasonable," *id.*—is well-taken but also unconvincing at this stage.

The Court agrees that the City will ultimately need to do more than make a conclusory assertion that G&H's estimates were an accurate forecast of harm. *See Koenings*, 377 N.W.2d at 601 (finding stipulated damages clause reasonable where evidence adduced at trial showed that "the stipulated and anticipated damages approximate each other and do not diverge"). But SJ Louis does nothing to explain why the City's actual damages from a lack of Final Completion were difficult to estimate or not "readily ascertainable," or why G&H's estimates of the City's liquidated damages "significant[ly] deviat[e]" from the amount to which the parties stipulated in the Contracts. *Wassenaar*, 331 N.W.2d at 363 (citation omitted). The existence of G&H's estimates, which do purport to forecast the City's actual damages, could support a conclusion that the damages were in fact ascertainable. SJ Louis has therefore failed to carry its burden at summary judgment to establish, with undisputed facts, that the liquidated damages amount was unreasonable at the time the parties entered the Contracts. *Kernz*, 667 N.W.2d ¶ 31.

The third reasonableness factor looks at whether the liquidated damages "reasonabl[y] forecast" actual damages "caused by a breach." *Id.* ¶ 30 (quoting *Wassenaar*, 331 N.W.2d at 363); *see also Westhaven*, 652 N.W.2d ¶ 24 (citing *Pollack v. Calimag*, 458 N.W.2d 591, 600 (Wis. Ct. App. 1990) and

*Koenings*, 377 N.W.2d at 604). SJ Louis must "persuade [the Court] that the damages it must pay under the [C]ontract[s] do not reasonably relate to the actual harm suffered by [the City]." *Westhaven*, 652 N.W.2d ¶ 31; *see also Wassenaar*, 331 N.W.2d at 364 ("If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable."). SJ Louis fails to do so.

As the City notes, "the only fact in the record pertaining to actual damages" is its assertion of having incurred $5.6 million in costs so far because of SJ Louis's failure to achieve Final Completion, which it acknowledges is "insufficient to determine the retrospective reasonableness" of the liquidated damages. ECF No. 53 at 11; *see supra* Section 3.2.4. SJ Louis disputes the City's asserted $5.6 million in actual damages as unsupported by the factual record. *Supra* Section 3.2.4. This dispute of fact begins and ends the analysis. The test for reasonableness of liquidated damages specifically requires the Court to "compare[] actual damages after the breach" to the liquidated damages forecasted in the contract. *Kernz*, 667 N.W.2d ¶ 42 (citation omitted). SJ Louis's argument that "the City's estimated Final Completion damages are not relevant" to the reasonableness of the liquidated damages rates in the Contracts, ECF No. 58 at 7, would require the Court to disregard the applicable legal standard. SJ Louis cannot both argue that the Final Completion liquidated damages rates are unreasonable as a matter of law *and* assert that a factual dispute exists on the ultimate amount of those Final Completion liquidated damages, which is an essential part of the analysis. This third factor weights against summary judgment for SJ Louis.

As a result, the Court need not further consider the City's argument that the available record evidence supports the reasonableness of its liquidated damages. ECF No. 53 at 11.

The "totality of the circumstances" analysis also enables the Court to look to policy considerations. *Koenings*, 377 N.W.2d at 604 ("[S]tipulated damages clauses may also be enforceable under the totality of the circumstances where they serve other valid economic purposes . . . ."); *see also Wassenaar*, 331 N.W. at 362 (discussing policy considerations for and against allowing stipulated or liquidated damages). The City briefed this issue only in passing arguing that the Final Completion liquidated damages "were designed . . . to protect the City from the cost of failing to comply with the Stipulated Judgment" and therefore are consistent with the policy considerations favoring liquidated damages. ECF No. 53 at 10 (citing *Wassenaar*, 331 N.W. at 362). Meanwhile, SJ Louis did not make any policy argument. Accordingly, the Court will address policy matters no further. *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived." (citing *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n.1 (7th Cir. 1996))).

Similarly, because Wisconsin law provides sufficient guidance at this juncture on the reasonableness of the liquidated damages, the Court will not engage with SJ Louis's appeals to out-of-state authority. ECF No. 44 at 10–12 (collecting and discussing cases from Illinois, New Jersey, and Washington).

For the above reasons, the Court will deny SJ Louis's motion for summary judgment insofar as it seeks a finding that the Final Completion liquidated damages in the Contracts are unreasonable as a matter of law.

### 4.1.2 HDD Design Responsibility

SJ Louis asserted in the original and supplemental complaints that "the City was responsible for supplying the designs for the Project, including the portions of the pipe installed by [HDD]," but that "those designs were defective and that the defects impacted SJ Louis's work." ECF No. 44 at 12 (citing ECF No. 19 at 2–3); *see also* ECF No. 1 at 2–3. At summary judgment, it contends that "the City has argued that SJ Louis assumed responsibility for the design of the HDD paths on the Project[] and that any issues arising out of the design of the HDDs are SJ Louis's responsibility." ECF No. 44 at 12–13; *id.* at 13 ("The City claims that [specified Contract language] . . . required SJ Louis to identify and fix any problems with the drawings supplied by the City with respect to HDD.").

Accordingly, it seeks a legal ruling that "it is not responsible for the design of the HDD pathways on CP5 and CP6." *Id.* at 3. In support of its position, SJ Louis argues that the City "attempt[ed] to shift responsibility for its own defective [HDD] design" onto SJ Louis in the Contracts, which is "flatly inconsistent with Wisconsin [public procurement] law." *Id.* at 18; *see also* ECF No. 58 at 11 (arguing that the City attempts to give it design "responsibility for a major portion of the Project"). Because any Contract imposing such responsibility would be illegal under Wisconsin's public procurement laws, SJ Louis argues, the Contracts "must be construed to avoid [this] lawless result" and therefore must be construed not to make SJ Louis responsible for HDD design. *Id.* at 19 (citations omitted).

The City understands SJ Louis as arguing that "the City had no legal authority to impose *any* design responsibility" on SJ Louis. ECF No. 53 at 18 (emphasis added). It responds that it is "not arguing that . . . 'SJ Louis was the Project designer,'" but rather that "the plain language . . . of the

[C]ontracts" allowed it to "delegate certain professional design responsibilities to SJ Louis" and that "no Wisconsin statute or caselaw prohibits such delegation." *Id.* at 20 (quoting ECF No. 44 at 18).[11]

Before analyzing whether the Contracts are consistent with Wisconsin public procurement law, as SJ Louis requests, the Court must first and foremost examine the Contracts to determine what the parties actually contracted to do. SJ Louis attempts to bypass this inquiry. *See* ECF No. 44 at 3 n.1 ("If this case is tried, SJ Louis will address and prove . . . [that] the City is misreading the Contract[s] to impose design responsibility on SJ Louis . . . ."); *id.* at 13–14 ("SJ Louis denies that this language, properly interpreted, actually imposes design responsibility on [it] . . . . However, for purposes of this motion, the City's position fails as a matter of law" because it "would render the Contracts illegal design-build contracts, beyond the City's power to let."). SJ Louis's promise to prove *at trial* that the City incorrectly reads the Contracts seems to concede that there is a genuine dispute of material fact as to what the Contracts require, raising the question of why SJ Louis believes that its HDD design responsibility argument is appropriate for summary judgment in the first place. The Court cannot possibly proceed to rule on SJ Louis's argument on Wisconsin public

---

[11]SJ Louis does not specify in its summary judgment briefing exactly what problems occurred with the HDD pathways, or the design thereof, for which it aims to avoid responsibility and/or thinks the City should be responsible. The City also does not specify the alleged problems but argues that SJ Louis is responsible for it. *See* ECF No. 44 at 18 ("Likely due to the multitude of self-inflicted issues SJ Louis experienced with respect to HDD 6.8 . . . , it now says that the City had no legal authority to impose any design responsibility. . . ." (citation omitted)).

The parties have noted in their undisputed facts a "failure in the Ryan Creek interceptor that was associated with the HDD work on the south side of Highway 100." ECF No. 50 at 16.

procurement law without first interpreting the Contracts to determine how they apportion design responsibility to each party. This is because addressing the former without first addressing the latter would require the Court to accept SJ Louis's reading of the Contracts, which would improperly invert the summary judgment burden by giving SJ Louis, the movant, the benefit of reasonable inferences in its favor. *See Bridge*, 815 F.3d at 360 (citation omitted). SJ Louis implicitly asks the Court to do just that.

The Court therefore begins by interpreting the Contracts under Wisconsin law. "[T]he construction of a contract is a question of law." *Elkhart Lake's Rd. Am., Inc. v. Chi. Hist. Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998) (citing *Weimer v. Country Mut. Ins. Co.*, 575 N.W.2d 466, 472 (Wis. 1998)). "Contract interpretation generally seeks to give effect to the parties' intentions." *Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, ¶ 25 (Wis. 2013) (citing *Seitzinger v. Cmty. Health Network*, 676 N.W.2d 426, ¶ 22 (Wis. 2004)). "[The Court] presume[s] the parties' intent is evidenced by the words they chose, if those words are unambiguous." *Id.* ¶ 26 (quoting *Kernz*, 667 N.W.2d ¶ 9).

"A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d. 67, 75 (Wis. 1996) (citing *Bank of Sun Prairie v. Opstein*, 273 N.W.2d 279, 282 (Wis. 1979) and *Jones v. Jenkins*, 277 N.W.2d 815, 819 (Wis. 1979)). "Contract language is construed according to its plain or ordinary meaning . . . ." *Tufail*, 833 N.W.2d ¶ 28 (citing *Huml v. Vlazny*, 716 N.W.2d 807, ¶ 52 (Wis. 2006)). "When a contract provision is ambiguous, and therefore must be construed by the use of extrinsic evidence, the question is one of contract interpretation for the jury." *Mgmt. Comput. Servs., Inc.*, 557 N.W.2d at 75 (collecting cases); *see also AVL Powertrain Eng'g, Inc. v.*

*Fairbanks Morse Engine*, 178 F. Supp. 3d 765, 780 (W.D. Wis. 2016) ("Summary judgment is not appropriate if 'the contract is ambiguous and the intent of the parties to the contract is in dispute.'" (quoting *Energy Complexes, Inc. v. Eau Claire County*, 449 N.W.2d 35, 40 (1989))).

The core question is therefore whether the plain language of the Contracts unambiguously delegates certain professional design responsibilities to SJ Louis. *See* ECF No. 44 at 13 ("SJ Louis denies that this language, properly interpreted, actually imposes design responsibility on SJ Louis for HDDs . . . ."); ECF No. 53 at 21 ("These contract provisions explicitly (and clearly) approve the delegation of professional design services in certain circumstances . . . ."); ECF No. 58 at 8 ("The Contracts do not make SJ Louis responsible for designing HDD pathways . . . .").

The Court finds that the relevant Contract provisions, *supra* Section 3.3.2, unambiguously delegate certain professional design responsibilities to SJ Louis.

To start, Article 7.19 of the General Conditions is titled "Delegation of Professional Design Services"; subsection A directs SJ Louis to furnish such services if "specifically required by the Contract Documents" or if such services "are required to carry out [its] responsibilities for construction means, methods, techniques, sequences, and procedures." This language clearly contemplates that SJ Louis might have, in some circumstances, professional design responsibilities. Indeed, SJ Louis concedes that "the General Conditions . . . do anticipate Contractor-performed design." ECF No. 58 at 9.[12]

_____

[12]SJ Louis briefly argues that, because the General Conditions are based on an industry standard form, "the possibility that [a] contractor might, in certain projects, have design responsibilities" as contemplated in Article 7.19(A) does not

The City argues that Section 33 05 22 of the Specification Books to the Contract Documents go on to delegate certain design responsibility as contemplated in Article 7.19(A) of the General Conditions. *See* ECF No. 53 at 21–22 ("These contract provisions plainly envision modifications to the HDD alignment [by SJ Louis] and discuss [it] 'design[ing] the proposed HDD installation.'" (citation omitted)). SJ Louis, on the other hand, argues that Section 33 05 22 "requires SJ Louis to follow the City's design" and then "refer[s] to SJ Louis's means and methods, not to the design it was to follow." ECF No. 58 at 10.

The Court agrees with SJ Louis that the lead provision of Section 33 05 22 seems to require it to follow the City's designs: it requires SJ Louis to "[p]rovide pipe installed via HDD . . . *as shown or specified*," presumably in the City's/G&H's designs for the proposed HDD pathways. *Supra* Section 3.3.2 (emphasis added). But the next sentence affirmatively delegates to SJ Louis design responsibility for "HDD installation details and methods *not shown or specified*" in those plans. *Id.* (emphasis added). This is consistent with Article 7.19(A) providing for the delegation of design responsibilities in certain circumstances, even if the City retained primary design responsibility.

SJ Louis's second point makes much of the fact that Section 33 05 22 refers to "details and methods," "installation method," field data, and means, arguing that these paragraphs cannot "alter[] the fundamental allocation between the [City's] design responsibility and [its] means and

---

necessarily mean that the Contracts in *this* case impose such responsibilities. *See* ECF No. 58 at 9. This argument fails because the Contracts here both contemplate design delegation in the General Conditions and then, as discussed below, make such a delegation in Section 33 05 22.

methods responsibility." ECF No. 58 at 10–11. But this sets up a false dichotomy between "design" and "means and methods" responsibility that the Contract language does not support. It does not matter that Section 33 05 22 refers to "details and methods," "installation method," and the like, because Article 7.19(A) also makes SJ Louis accountable for any design services that are "required to carry out [its] responsibilities for construction means, methods, techniques, sequences, and procedures." Section 33 05 22 and Article 7.19(A) together delegate to SJ Louis design responsibilities concerning "means and methods."[13] For the same reason, SJ Louis's argument that another portion of Section 33 05 22—requiring it to supply a Licensed Professional Engineer's certification of having "evaluated and approved [its] HDD plan and working drawings for the HDD"—fails. *See id.* at 11 ("[A]t most [this provision] requires SJ Louis to have the work necessary to confirm its means and methods . . . performed by a licensed engineer.").

In sum, the plain language of the Contract unambiguously delegates certain professional design responsibilities to SJ Louis, and therefore the Court "presume[s] the parties' intent is evidenced by the words they chose" and will give effect to that intent. *Tufail*, 833 N.W.2d ¶ 26 (citation omitted). Because the plain language of the contract is unambiguous, the Court need not consider facts or the parties' arguments regarding extrinsic evidence, or SJ Louis's argument that "it would have raised the [design responsibility] issue" if it had known during the bidding process that the City would construe the Contracts to delegate to SJ Louis design responsibility for a

---

[13]Relatedly, General Condition 7.01 makes SJ Louis "solely responsible for the means, methods, techniques, sequences, and procedures of construction."

"major portion of the Project." ECF No. 50 at 14–16; ECF No. 53 at 24–26; ECF No. 58 at 11–13.

Importantly, the Court cannot say whether any design that SJ Louis solicited or performed was indeed necessary and "required to carry out [its] responsibilities for construction means, methods, techniques, sequences, and procedures," because the parties have not briefed this issue and presumably it will require further factual development. Similarly, as noted above, the parties have not specified what, exactly, the problems with the HDD were, so at this juncture the Court can opine only on what the Contract language requires; it will be up to a jury to decide whether the HDD problems that arose actually fell within the scope of the design responsibility delegated to SJ Louis or whether SJ Louis fulfilled that responsibility. As the City notes, SJ Louis's summary judgment argument is "not tied to any claim." ECF No. 53 at 29. At any rate, there is no genuine dispute of fact that the Contracts delegated certain professional design responsibility to SJ Louis.

Having determined that the Contracts delegate certain professional design responsibilities to SJ Louis, the Court can finally turn to SJ Louis's primary argument on summary judgment: that this delegation is inconsistent with Wisconsin public procurement law. *See* ECF No. 44 at 12–19. SJ Louis relies on Wisconsin Statutes § 62.15, *id.* at 14, which states:

> **(1)** CONTRACTS; HOW LET; EXCEPTION FOR DONATED MATERIALS AND LABOR. All public construction, the estimated cost of which exceeds $25,000, shall be let by contract to the lowest responsible bidder . . . .
>
> **(2)** PLANS; CONTRACT; BOND. When the work is required or directed to be let to the lowest responsible bidder, the board of public works shall prepare plans and specifications for the same, containing a description of the work, the materials to be

used and such other matters as will give an intelligent idea of the work required and file the same with the city clerk for the inspection of bidders, and shall also prepare a form of contract and bond with sureties required, and furnish a copy of the same to all persons desiring to bid on the work.

The parties stipulate that the Contracts were design-bid-build projects, in which bidders submitted bids based on plans and specifications supplied by the City. *Supra* Section 3.3.1. The notice to bidders stated that § 62.15 applied to the Projects. *Id.*

SJ Louis argues that this statute "required" the City "to supply a complete design—not obtain that design from its eventual construction contractor." ECF No. 44 at 14. The parties do not dispute that the City supplied Contract Drawings in the bid process, which showed a proposed pathway for each HDD, *supra* Section 3.3.1, and SJ Louis makes no argument that the City's initial Contract Drawings did not follow § 62.15(2)'s requirements. Rather, it says that "the City demonstrated through its actions that the Project was a design-bid-build Project up and until the point that SJ Louis pointed out widespread errors in the HDD designs," at which time it "began to claim that SJ Louis was the Project designer." ECF No. 44 at 18. In other words, SJ Louis argues that the City pulled a bait-and-switch: in practice, the Contracts effectively gave SJ Louis "[d]esign-[b]uild [r]esponsibility"—which Wisconsin law permits under only limited circumstances and which requires bidders to follow a different process than the design-bid-build process specified in § 62.15. *Id.* at 12–13, 15–16; *id.* at 18 ("[The City's] after-the-fact attempt to shift responsibility for its own defective design is flatly inconsistent with [§ 62.15].").

The City responds that SJ Louis misreads § 62.15(2) as requiring complete designs up front. ECF No. 53 at 27. Section 62.15 requires the

City's plans to "give an intelligent idea of the work required" but "does not indicate how detailed the plans and specifications must be," it argues. *Id.* (emphasis omitted). It maintains that its plans met this requirement, but points out that SJ Louis has not argued that the plans failed to meet the "intelligent idea" requirement of the statute, acknowledging that resolution of this question is "ultimately a question for the factfinder with the assistance of expert testimony." *Id.* (quoting § 62.15(2); emphasis omitted).

The Court finds that the delegation of certain design responsibilities in the Contracts comports with Wisconsin Statutes § 62.15(2). "As instructed by the Wisconsin Supreme Court, [the Court] first consider[s] the statute's language . . . ." *Wittman v. Koenig*, 831 F.3d 416, 421 (7th Cir. 2016) (citing *State ex rel. Kalal v. Cir. Ct. for Dane County*, 681 N.W.2d 110, ¶¶ 40–54 (Wis. 2004)); *see also Kalal*, 681 N.W.2d ¶ 45 ("[S]tatutory interpretation 'begins with the language of the statute. If the meaning [of the statute] is plan, [courts] ordinarily stop the inquiry.'" (quoting *Seider v. O'Connell*, 612 N.W.2d 659, ¶ 43 (Wis. 2000); other citations omitted)). The text of § 62.15(2) required the City to "prepare plans and specifications" for the Projects, "containing a description of the work, the materials to be used and such other matters as will give an intelligent idea of the work required." Nothing in this language prohibits the City from delegating some portion of design responsibilities to SJ Louis, particularly where those design responsibilities pertain to—as SJ Louis itself argued and as discussed at length above—the details, means, and methods of the Projects.[14] Nor does the plain text of the

---

[14]Because SJ Louis has leaned so heavily on the Contracts delegating it responsibility for design details, means, and methods, its argument that the City cannot "suggest that design delegation for a portion of a contract is permissible when the delegation of the entire contract design is not" rings hollow. ECF No. 58 at 14.

statute require the City to supply a "complete" design, as SJ Louis insists. That word does not appear in the statute, and the words that do appear ("plans and specifications . . . containing a description of the work . . . as will give an intelligent idea of the work required") support the City's reading of the statute.

SJ Louis cites a 1978 Wisconsin case interpreting a different competitive bidding statute to assert that "[c]ompetitive bidding," as contemplated in § 62.15, "requires full, clear, definite, and precise specifications, for there must be a common standard by which to permit the comparison of bids." ECF No. 44 at 14 (quoting *Waste Mgmt., Inc. v. Wis. Solid Waste Recycling Auth.*, 267 N.W.2d 659, 665 (Wis. 1978)) (internal quotation marks omitted). This case interpreted the former Wisconsin Statutes § 499.19. *Waste Mgmt.*, 267 N.W.2d at 662–63. As far as the Court can glean, this particular provision no longer exists in the Wisconsin Statutes. Even if it did, the language of that statute differs from § 62.15: it required the Wisconsin Solid Waste Recycling Authority to "determine the format, contents, and scope of any contract for construction of [its] facilities . . . , the conditions under which bidding shall take place[,] and the schedule and stipulations for a contract award." *Id.* at 663 (quoting former WIS. STAT. § 499.19). SJ Louis does not explain why *Waste Management*'s reading of a now-defunct Wisconsin law that uses different language from § 62.15 and which governed an entirely different government entity and set of bidding circumstances than are present in this case should affect the Court's reading of § 62.15. Because the Court begins and ends with the language of the particular statute at issue, *Kalal*, 681 N.W.2d ¶ 45, it considers *Waste Management* inapposite. SJ Louis has not pointed to any other provision in Wisconsin law that is more akin to § 62.15 or to any case

law interpreting it, and the Court has not located any such authority. In the absence of guidance from the Wisconsin courts, the Court relies on the plain language of § 62.15, which does not support the meaning that SJ Louis attempts to impose on it.

For these reasons, the Court will deny SJ Louis's motion for summary judgment on the issue of HDD design responsibility. Because the Court resolves this issue on the statutory text alone, it will not address the parties' arguments about the statute's purpose or SJ Louis's policy-based arguments. ECF No. 53 at 27–29; ECF No. 58 at 15–16. As with the matter of contract interpretation discussed above, the Court is not determining at this juncture that the plans that the City provided during the bid process actually met § 62.15's "intelligent idea of the work" requirement, as SJ Louis has not put any facts or argument relating to this question before the Court.

### 4.2 The City's Motion for Summary Judgment

#### 4.2.1 Baseline Schedule

The City argues that SJ Louis had contractual responsibility for its own schedule and construction means, methods, techniques, sequences, and procedures but improperly attempted to rely on its own "inability . . . to install pipe according to its own baseline schedules" in various CORs seeking increases in contract time or price. ECF No. 52 at 4–10. Accordingly, the City seeks a finding "as a matter of law that SJ Louis is not entitled to any additional Contract Time or Contract Price" on five specific CORs: CP2B COR 22, CP5 COR 36, CP5 COR 37, CP6 COR 43, and CP6 COR 50. *Id.* at 8–10; *see also* ECF No. 57 at 6 (seeking a finding "that the City did not breach its contractual obligations in denying the disputed CORs").

The parties first point to different provisions in the Contracts as governing the issue. *Compare* ECF No. 52 at 5–6 *with* ECF No. 54 at 4 ("[T]he

terms of the Contract entitle SJ Louis to additional time and/or additional costs due to the City's disruption and interference in the performance of its work."); *see supra* Section 3.4.1 (outlining Contract provisions related to possible price and time adjustments for delays "caused by or within the control of [the] Contractor" and limitations on the City's, G&H's and B&V's responsibilities, as well as Contract provisions related to related to possible price and time adjustments for Owner- or Engineer-caused delays).

The parties do not dispute the provisions of the Contracts or argue that they are ambiguous. Rather, they dispute which of those provisions apply—and therefore either entitle SJ Louis to more contract time and/or price, or not—based on the reasons given in the subject CORs. The Court therefore need not interpret the referenced Contract language per se. Rather, the Court must focus its analysis on each of the CORs at issue, and what reason(s) those CORs and supporting documents reveal as the basis for SJ Louis's requests for more contract time and/or price.

As a threshold matter, the parties seem to agree that the CORs and supporting documents are admissible hearsay and therefore that the Court may consider the substance of the documents for the truth of the matter asserted, that is, SJ Louis's claimed reason(s) for its increase requests. *See supra* Section 3.1 (stipulating that CORs and claims were prepared by or at the direction of Wizner, SJ Louis's Project Manager, in the normal course of business). Presumably, they are so stipulating pursuant to Federal Rule of Evidence 803(6), the business records hearsay exception, but they have not briefed how this rule applies[15] even though evidence "must be admissible

---

[15]Nor have they addressed whether the CORs are properly authenticated or self-authenticating. *See* FED. R. EVID. 901, 902(11).

in content" to be considered at summary judgment. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (citing *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–78 (7th Cir. 1994)); *but see In re Broiler Chicken Antitrust Litig.*, No. 1:16-CV-08637, 2020 WL 4349889, at *2 (N.D. Ill. July 29, 2020) ("The parties may . . . be able to stipulate to the authenticity of documents . . . while reserving the right to dispute assumptions, interpretations, or inferences drawn from the evidence. . . . Stipulations may be sought with respect both to the facts of the case and to matters that affect admissibility of other evidence, such as the authenticity of records and foundation requirements for exceptions to the hearsay rule under Federal Rule of Evidence 803(6) . . . ." (quoting MANUAL FOR COMPLEX LITIGATION (FOURTH) §§ 11.33 and 11.471 (2004))).

The Court will accept the parties' apparent agreement as to admissibility for purposes of summary judgment and will consider the substance of the COR documents. It must credit SJ Louis's given reasons for its time and/or price increase requests. *Abdullahi*, 423 F.3d at 769 ("At summary judgment a court . . . must view all the evidence in the record in the light most favorable to the non-moving party . . . ." (citing *Anderson*, 477 U.S. at 255)).

The parties each reference many of the same statements from the same CORs and supporting documents as proving their position. *See* ECF No. 52 at 8–10; ECF No. 54 at 7–9; ECF No. 57 at 4–6. The Court addresses the CORs in three batches based on the nature of those statements.

### 4.2.1.1    CP2B COR 22, CP5 COR 36, and CP6 COR 50

These three CORs and supporting documents are reproduced in relevant part *supra* Section 3.4.2.1. The City argues that the following

language in these COR documents demonstrates that SJ Louis's time and/or price increase requests are based on its inability to comply with its own baseline schedule:

- "SJ Louis experienced cost and time impacts to its pipe installations when mobilizing to additional locations not detailed in its baseline schedule, and which could not have been anticipated."
- "These mobilizations incurred by SJ Louis were the direct result of the GWA's numerous changes, delays, and interferences on the Project that prevented SJ Louis from performing the work in its planned sequence."

ECF No. 52 at 8–9; *see also supra* Section 3.4.2.1. Further, it argues, even if SJ Louis could not "perform the work in its planned sequence," the Contracts made SJ Louis solely responsible for its own sequence of construction, and therefore the CORs were properly denied. ECF No. 52 at 9–10; *see also* ECF No. 57 at 4 ("Even if these assertions were true, SJ Louis does not provide any legal or contractual support for why the City should be responsible for SJ Louis's inability to work in a particular space at a particular time."). SJ Louis points to the exact same language as showing that any delays necessitating its CORs were outside of its control. ECF No. 54 at 7.

The Court finds that summary judgment is inappropriate as to these three CORs. The City's position asks the Court to assess SJ Louis's CORs and baseline schedule in a vacuum without regard to the potential cause(s) of deviation from that schedule. But SJ Louis's COR documents do enough to create a dispute of fact as to what that cause was and whether the City was in some way responsible for it. In short, these CORs can be fairly read to support either side's position, which defeats summary judgment.

Articles 4.05 and 7.01 of the General Conditions make SJ Louis solely responsible for its own sequences of construction and preclude any increases in contract time or price for delays, disruptions, or interferences caused by it or within its control. *See supra* Section 3.4.1. At the same time, Article 4.05 provides that "[i]f Owner [the City], Engineer [G&H] . . . delays, disrupts, or interferes with the performance or progress of the Work, then Contractor shall be entitled to an equitable adjustment in the Contract Times and Contract Price." Based on the wording of this provision, the phrase "the performance or progress of the Work" must surely encompass SJ Louis's anticipated work sequence or baseline schedule—SJ Louis's sequence or schedule for the work would be one way to assess "the performance or progress" of that work. Notwithstanding Article 7.01 making SJ Louis contractually responsible for its own schedule, Article 4.05 contemplates scenarios where SJ Louis is responsible for delays as well as scenarios where the City's actions impact its schedule.

It is not possible to determine, based only on what is stated in the COR documents, which of these contractual provisions applies. The City would have the Court find that SJ Louis admitted in these CORs that it planned to execute its work one way, could not do it that way, and then tried to blame the City for why its plan fell apart. That is certainly one possible reading of the statements in the CORs. However, giving SJ Louis the favorable inferences to which it is entitled on summary judgment, SJ Louis presumably drafted its CORs with the latter contract provision in mind and sincerely believed that the City or G&H (referred to as GWA in the COR, *see supra* note 2) had, in fact, caused the delays in SJ Louis's performance and progress. That reading of the CORs suggests that the City's actions did, in fact, interfere with SJ Louis's performance or progress

and necessitated the CORs.[16] The City even acknowledges the possibility of multiple causes for SJ Louis's requested increases, noting that SJ Louis's CORs "are based, *at least in part*, on deviations from [the] baseline schedule." ECF No. 57 at 4 (emphasis added). If there could be multiple causes for the requested increase, is it not possible that some of those causes might be beyond SJ Louis's control and/or directly attributable to the City?

The bigger problem with the City's position is that it fundamentally asks the Court to resolve a dispute of fact in the absence of relevant evidence. It seeks to rely on what SJ Louis (through Wizner or another representative) represented in the COR documents. But the true cause of SJ Louis's deviation from its projected schedule—which determines which of the above contractual provisions applies—likely cannot be resolved without extensive testimony from, for example, Wizner, the B&V representative who denied the CORs, and others with knowledge about what the facts on the ground were, and perhaps also expert opinions as to the cause(s) of delays and schedule deviations. The parties have not put this evidence before the Court. In any event, based on the record before it, the Court cannot decide whose explanation of the need for the COR is the

---

[16]SJ Louis also attempted to justify CP2B COR 22 by referencing the City of Muskego's "erroneously withholding a permit." *Supra* Section 3.4.2.1. Article 4.05 makes SJ Louis and the City each responsible for delays, disruptions, or interferences within their respective control, whereas General Conditions Article 8.03 "any utility owner" causing delays to or interfering with SJ Louis's work. *Supra* Section 3.4.

It also attempted to justify the same COR as caused by "structural flaws in the HDD 6.8 . . . design." *Supra* Section 3.4.2.1. As explained *supra* Section 4.1.2, the Court is not in a position to determine whether any alleged flaws in the HDD design were attributable to SJ Louis pursuant to the design responsibility delegated to it in the Contracts.

correct one. *Abdullahi*, 423 F.3d at 769 ("At summary judgment a court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence . . . ." (citing *Anderson*, 477 U.S. at 255)). The Court decides only that SJ Louis could possibly have been entitled under the Contracts to the time and price increases it requested in these CORs.

#### 4.2.1.2        CP5 COR 37

This COR and its supporting documents are reproduced in relevant part *supra* Section 3.4.2.2. The City argues that SJ Louis's assertion that it had to install open cut pipe "in a scattered and interrupted fashion," causing "labor productivity loss," demonstrates that SJ Louis's price increase request is based on its own inability to comply with its own baseline schedule. ECF No. 52 at 9. SJ Louis responds that it detailed six reasons to justify this COR, among them "the City's untimely responses to SJ Louis's submittals and RFIs," and none of which were attributable to its inability to follow its baseline schedule. ECF No. 54 at 8; *see also supra* Section 3.4.2.2.

For the same reasons as above, SJ Louis's proffered reason in this COR introduces a dispute of fact on what circumstances necessitated the COR and whether the City was in some way responsible for them. Accordingly, the Court cannot say as a matter of law that the COR was properly denied. As above, the Court does not decide whose explanation of the need for the COR is the correct one, only that SJ Louis could possibly have been entitled under the Contracts to its requested price increase in CP5 COR 37.

#### 4.2.1.3        CP6 COR 43

This COR and its supporting documents are reproduced in relevant part *supra* Section 3.4.2.3. The City argues that SJ Louis sought this increase

in contract time because there were initially "too few locations available . . . for [it] to perform its work in a cost-effective uninterrupted fashion as planned in [its] . . . baseline schedule," so it chose to "wait[] to start pipe installation." ECF No. 52 at 9. SJ Louis attributes its decision to wait to, among other reasons, the City's "fail[ure] to obtain many required permits by the time the Project was scheduled to start." ECF No. 54 at 8.

For the same reasons as above, SJ Louis's proffered reason in this COR introduces a dispute of fact on what circumstances necessitated the COR and whether the City was in some way responsible for them. Accordingly, the Court cannot say as a matter of law that the COR was properly denied. As above, the Court does not decide whose explanation of the need for the COR is the correct one, only that SJ Louis could possibly have been entitled under the Contracts to its requested price increase in CP6 COR 43.

For all these reasons, the City is not entitled to summary judgment on this issue. Viewing the current factual record in the light most favorable to SJ Louis, the Court cannot conclude that the City did not breach its contractual obligations in denying these five CORs.

Because the Court finds that a factual dispute precludes summary judgment for the City, it does not address SJ Louis's argument that any reference to its baseline schedule is "merely evidence of [its] damages," "not, itself, the basis for [its] request for additional compensation." ECF No. 54 at 8. Nor does the Court address SJ Louis's defense of its use of its baseline schedule to demonstrate its delays and damages as permissible under Wisconsin and federal contracting law. *Id.* at 10–13.

The Court will also not address SJ Louis's argument that "the implied warranty of design accuracy and adequacy" gives it "the right of

recovery when the plans and specifications it receives are inaccurate or inadequate," as this is bound up in the HDD design issues discussed *supra* Section 4.1.2. Additionally, the Court does not engage with the parties' back-and-forth about what the complaint and supplemental complaint say. ECF No. 52 at 7; ECF No. 54 at 6–7. This case is well beyond the pleading stage; what matters now is what the factual record reveals—which, as described above, is disappointingly little for how long this case had been pending as of the time summary judgment motions were filed.

### 4.2.2    CORs Based on Averages

The City additionally seeks a finding that it did not breach the Contracts when it denied certain of SJ Louis's CORs that SJ Louis based on "average rates, average crews, average times, and estimates." ECF No. 52 at 15. In support of this point, the City first argues that SJ Louis's submissions that relied on such averages and estimates failed to satisfy contractual provisions requiring SJ Louis to furnish "supporting data that substantiate the proposed increase in Contract Time and/or Price—that is, documentation that the work was necessary and was in fact performed." *Id.* at 15–16. SJ Louis responds that the relevant Contract provisions are ambiguous and the Contract's reference to "supporting data" does not preclude the use of averages or "informed estimates." ECF No. 54 at 14–18.

The relevant Contract provisions are laid out *supra* Section 3.5. In brief, SJ Louis was required to "substantiate" its requests for increases in contract time and price with "supporting data" as well as a "written statement that the supporting data are accurate and complete" and "accurately reflect[] the full amount to which [SJ Louis believes it is] entitled." *Id.* Wisconsin's contract interpretation standard is detailed *supra* Section 4.1.2. Applying this law to the Contract provisions at issue, the

Court finds that the Contracts are ambiguous as to what SJ Louis could submit to support its CORs.

The Contracts do not define "supporting data" or "substantiate." Relying on dictionary definitions, the City argues that the use of these terms unambiguously shows that "the Contracts impose on SJ Louis the obligation to provide facts that corroborate . . . that the additional Contract Time or Contract Price sought is actually required because of the event giving rise to the adjustment sought." ECF No. 52 at 14–15 (italics omitted); *see also id.* at 11 (arguing that the Contracts required SJ Louis to provide "actual data" in support of CORs). "A dictionary may be utilized to guide the common, ordinary meaning of words," and "[r]eliance on a dictionary . . . does not render a word or phrase ambiguous." *Noffke ex rel. Swenson v. Bakke*, 760 N.W.2d 156, ¶¶ 10, 18 (Wis. 2009) (citing *Kalal*, 681 N.W.2d ¶ 53; and *State v. Sample*, 573 N.W.2d 187, ¶ 21 (Wis. 1998)).

But none of the dictionary definitions it offers definitively support its reading. Its proffered definitions of "support" and "data" support only, as it admits, that "supporting data. . . . must furnish corroborating facts that can be analyzed in deciding whether to approve or deny the COR." ECF No. 52 at 14 (citing *Support* and *Data*, AM. HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=support [perma.cc/RR78-TXKB] and https://ahdictionary.com/word/search.html?q=data [perma.cc/LB4N-GBD6] (both last visited Mar. 30, 2026)). Its proffered definition of "substantiate" refers to "competent evidence" or "proof." *Id.* (quoting *Substantiate*, BLACK'S LAW DICTIONARY (11th ed. 2019) and *Substantiate*, AM. HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=substantiate [perma.cc/QA44-NGKC] (last visited Mar. 30, 2026)).

The Court agrees generally that the requirement to furnish "supporting data" means that SJ Louis had to "furnish corroborating facts that can be analyzed in deciding whether to approve or deny the COR," *id.* at 14, but cannot join the City in the logical leap it makes from there: that the Contracts unambiguously required the supporting data to be in a particular form or follow a particular methodology of corroboration. The City asks the Court to assume that "competent evidence"—a term that does not appear in the Contracts—must, for purposes of the substantiation requirement in the Contracts, refer to documentation of actual expenses rather than averages. But the that reading is not apparent from the plain language of the Contract provisions at issue. Nor is the City's preferred reading that any supporting data that SJ Louis submitted could not be based on averages and instead had to be based on SJ Louis's actual, documented expenses.

The City references but makes no argument regarding Article 13.01, which defines "Cost of the Work" as "the sum of all costs necessary for the proper performance of the Work at issue." ECF No. 52 at 11–12; *supra* Section 3.5. The plain language of this provision also does not state that necessary costs are *actual* costs or define how costs are to be substantiated. It does require SJ Louis to "establish and maintain records [of costs] . . . in accordance with generally accepted accounting practice" and submit to G&H "an itemized cost breakdown together with supporting data" in support of CORs. *Supra* Section 3.5. This particular requirement supports the City's reading that "supporting data" must take a specific form.

However, the previously-referenced provisions support SJ Louis's broader reading.[17]

The Court is not able to determine, based on the plain language of the Contracts, what procedure the parties intended to follow with respect to substantiating CORs. Accordingly, summary judgment is not appropriate. *AVL Powertrain Eng'g, Inc.* 178 F. Supp. 3d at 780 (citation omitted). The Court therefore need not wade further into whether the CORs at issue did, in fact, validly establish that SJ Louis was entitled to additional contract time and/or price.

**5.    CONCLUSION**

For the reasons stated below, both motions for summary judgment will be denied in full. The Court will set this case for an in-person status conference on May 8, 2026 at 10:00 a.m. in Courtroom 425, 517 E. Wisconsin Ave., Milwaukee, Wisconsin 53202. The attorneys for each party who will try the case must attend.

Accordingly,

**IT IS ORDERED** that Plaintiff S.J. Louis Construction, Inc.'s motion for partial summary judgment, ECF No. 43 be and the same is hereby **DENIED**;

---

[17]This provision also provides that "[w]hen the value" of contract time or price adjustments "is determined on the basis of the Cost of the Work," SJ Louis "is entitled only to those additional or incremental costs required because of the change in the Work or because of the event giving rise to the adjustment." *Supra* Section 3.5. But this language seems to act more as a guide to the decision-maker's discretion over what is an allowable expense, and less as a rule about what SJ Louis can or cannot submit in support of its CORs.

**IT IS FURTHER ORDERED** that Defendant the City of Waukesha's motion for partial summary judgment, ECF No. 51, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that an in-person status conference will be held on **May 8, 2026 at 10:00 a.m.** in Courtroom 425, 517 E. Wisconsin Ave., Milwaukee, Wisconsin 53202; the attorneys for each party who will try the case must attend.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2026.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge